[Cite as *In re B.H.*, 2018-Ohio-5176.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 106656**

**IN RE: B.H.**

[Appeal by L.H., Mother]

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD 16900331

**BEFORE:** McCormack, P.J., Laster Mays, J., and Keough, J.

**RELEASED AND JOURNALIZED:** December 20, 2018

**ATTORNEY FOR APPELLANT**

Laura Wellen
Thrasher Dinsmore & Dolan
100 7th Avenue, Suite 150
Chardon, OH 44024


**ATTORNEYS FOR APPELLEE**

**For CCDCFS**

Michael C. O'Malley
Cuyahoga County Prosecutor

Michelle A. Myers
Assistant County Prosecutor
3955 Euclid Ave., Room 313-E
Cleveland, OH 44115

**For G.W.**

G.W., pro se
7210 East Ridge Drive
Hyattsville, MD 20785

**For B.H.**

Pamela A. Hawkins
P.O. Box 43101
Richmond Heights, OH 44143

**ALSO LISTED:**

**Guardian Ad Litem for Child**

Jonathan Z. Wilbur
13940 Cedar Rd., Ste. #246
Cleveland Heights, OH 44118

**Guardian Ad Litem for Mother**

Tyrone C. Fazio
1360 East 9th Street
The IMG Center, Suite 910
Cleveland, OH 44114

TIM McCORMACK, P.J.:

{¶1} Appellant L.H. ("Mother") appeals from a juvenile court judgment ordering his son, B.H., to be placed in a planned permanent living arrangement. For the reasons that follow, we affirm the juvenile court's judgment.

**Procedural and Substantive History**

{¶2} On January 7, 2016, Mother took her son, B.H., then 15 years old (D.O.B. 3/23/2001), to the Cleveland Clinic to be treated for eczema. At the time, B.H.'s eczema was severe enough that it required overnight admission and body wraps. At some point during the course of this visit, Mother made inflammatory comments to Clinic staff and behaved erratically. Police were called, and Mother was ultimately arrested on an outstanding warrant and incarcerated. When B.H. was ready to be released and did not have a guardian to whom he could be released, Clinic officials contacted the Cuyahoga County Department of Children and Family Services ("CCDCFS"). B.H. was placed in the emergency custody of the agency upon his release on January 9.

**{¶3}** On January 11, 2016, the agency filed a complaint alleging that B.H. was dependent. Upon Mother's release from jail approximately two months later, she engaged in a supervised visit with B.H.

**{¶4}** The agency developed a case plan. One concern identified in the case plan was Mother's erratic behavior and history of displaying paranoia and emotional instability. The case plan instructed Mother to undergo a psychiatric evaluation to determine if she had mental health issues that needed to be addressed.

**{¶5}** On or about March 29, 2016, B.H. left his foster home placement and could not be located. Following a hearing on March 30, 2016, B.H. was adjudicated dependent. Following a hearing on April 1, 2016, the court committed B.H. to the temporary custody of the agency. In the corresponding journal entry, the court stated that Mother had stated she would not comply with case plan services, including undergoing a mental health assessment. The court also noted that B.H. was "AWOL" from his foster placement.

**{¶6}** The agency eventually learned that B.H. was with Mother at her house. On May 5, 2016, B.H.'s guardian ad litem ("GAL") filed a motion for the court to conduct an emergency in-camera interview of B.H. The court granted this motion and ordered Mother to appear in court the next day and produce B.H. Mother failed to appear on May 6, and the court issued a warrant for her arrest. Mother was subsequently arrested. On May 26, 2016, B.H. was removed from her home. He was placed in Belmont Pines, a residential behavioral health hospital because, according to a case plan assessment, his immediate needs were too great to be placed in a less restrictive setting and he required stabilization. Specifically, officials were concerned that B.H. was a danger to himself and others.

**{¶7}** On May 27, 2016, Mother appeared in court for a contempt hearing. The court ordered that Mother be released and that Mother and B.H. have supervised phone calls three times a week. The court continued the hearing on the issue of Mother's contempt of court. A subsequent hearing was held on June 21, 2016. Mother did not attend the hearing, but she did contact the court. Following this hearing, the court ordered that there be no contact between Mother and B.H. over the objections of Mother's counsel.

**{¶8}** A Semi-Annual Review of the case plan was filed on July 8, 2016. As of this time, Mother had made no progress on the case plan. On July 26, 2016, B.H. was "stepped down" from his placement at Belmont Pines and placed in a residential foster home. Six days later, after threatening his foster family, B.H. was removed from the foster family placement and returned to Belmont Pines.

**{¶9}** Mother underwent a partial psychological assessment with a court clinical psychologist on August 1, 2016. She completed the interview portion of the assessment but refused to undergo any further evaluation. On October 12, 2016, an amended case plan was filed, noting that efforts to stabilize B.H. had been unsuccessful and further evaluation and treatment were needed. Mother's case plan objectives remained the same.

**{¶10}** On November 28, 2016, the agency filed a motion to modify temporary custody to permanent custody. The court held a pretrial hearing on December 14, 2016, at which point it lifted the no contact order as to telephone contact between Mother and B.H.

**{¶11}** In a Semi-Annual Review filed on January 10, 2017, the social worker noted that while Mother completed the interview portion of her psychiatric evaluation at some point during the summer of 2016, she had yet to complete the written portion of the evaluation or to engage in other recommended services. The Semi-Annual Review also noted that B.H. was diagnosed

with major depressive disorder with psychotic features and was being actively evaluated to rule out a diagnosis of schizoaffective disorder.

{¶12} On April 4, 2017, counsel for B.H. filed a motion requesting the court to order that he be transported from Belmont Pines to his pretrial hearing on April 10, 2017, and all future hearings in this case. Also on April 4, 2017, Mother filed a motion for legal custody to herself. On April 7, 2017, the GAL filed a report and written recommendation on the issue of transporting B.H. for the pretrial hearing. In his report, the GAL stated that the staff at Belmont Pines had expressed concern about the impact that transporting B.H. would have on his treatment progress. B.H. had been reacting poorly to telephone contact with Mother, and this had provoked a period of regression in which B.H. was not taking his medication as instructed and not actively participating in therapy. The report also noted concerns that B.H. would go "AWOL" based on statements he had made. Ultimately, the GAL recommended that B.H. not be transported to his pretrial hearing.

{¶13} Mother subsequently filed a series of motions, requesting that the assigned social worker be removed from the case, requesting an earlier court date, requesting the assigned magistrate be removed from the case, and requesting that B.H. be transported from his residential facility in Youngstown to Cleveland for pretrial hearings. The case was assigned to a new judge, and the other motions were denied.

{¶14} On June 21, 2017, the GAL filed a report and recommendations as to the appropriateness of communications between B.H. and Mother. The GAL noted that Mother had failed to comply with the agency and had repeatedly encouraged B.H. not to take his medications. According to staff at Belmont Pines, B.H. had been improving. The GAL recommended that

B.H. and Mother be permitted to have phone calls every 10 days and that Mother refrain from discussing the case during these phone calls.

{¶15} On June 7, 2017, the court held a pretrial hearing in which B.H.'s attorney and GAL made oral motions to continue the trial on the grounds that it was in B.H.'s best interest, given his progress and concerns that the stress of trial would disrupt this progress. The court granted the motion to continue the trial over the objections of the agency.

{¶16} In an Semi-Annual Review filed on June 22, 2017, the social worker noted that B.H. has no specific mental health diagnosis but continues to struggle with anxiety, aggression, and thought disorders. B.H. continued to progress at Belmont Pines. As a result of his progress, staff at Belmont Pines issued a step-down letter on July 26, 2017, noting that B.H. had displayed an increase in mood stability and had not made recent attempts to become "AWOL." Due to his progress, it was recommended that B.H. be moved to a less restrictive setting and continue in individual therapy and medication.

{¶17} On September 5, 2017, the GAL filed an updated report and recommendations. The GAL stated that B.H.'s release from Belmont Pines was imminent. Accordingly, the agency was actively looking for an appropriate placement for B.H. The report noted that Mother is "undoubtedly a loving and caring mother" to B.H. The GAL also noted that Mother's ongoing noncompliance with the case plan, which can likely be attributed to serious underlying mental health issues, had negatively impacted her relationship with B.H. According to a former therapist of B.H. at Belmont Pines, Mother is a diagnosed paranoid schizophrenic. At various points throughout this case, Mother disputed this diagnosis. The GAL pointed out that even without a formal diagnosis in the record at this point, Mother's behavior and statements throughout the case are illustrative of her delusional thinking and paranoia. Mother made

repeated statements, both to B.H. and to the court, to the effect that B.H. had been "stolen" and that various individuals involved in the case — including the magistrate, the social worker, and police officers — were "pigs" who were seeking to abuse and harm B.H. Mother allegedly exhibited similar behavior toward B.H.'s foster parents, the social worker involved in the case, and staff at the Clinic at the outset of this case. With respect to this case, the GAL's primary concern regarding Mother's behavior is that it has resulted in noncompliance with her own case plan and a lack of cooperation with B.H.'s case plan. Specifically, Mother repeatedly refused to undergo a psychological assessment, was not receptive to family counseling with B.H., and consistently advised B.H. not to take his medications. The GAL reported that B.H. wished to be returned to Mother's custody, but appeared to be aware that this might not be feasible. Ultimately, the GAL recommended that B.H. be committed to the agency's permanent custody, but noted that a planned permanent living arrangement may be a more appropriate disposition for B.H., although the agency had not requested a planned permanent living arrangement as of the date of the report.

{¶18} On October 30, 2017, the GAL submitted an updated report and recommendations. The GAL updated his recommendation and concluded that a PPLA would be the best outcome for B.H. The GAL also updated his report to include information from Mother's partial psychiatric assessment that had been completed over a year earlier. He noted that the doctor evaluating Mother concluded that although Mother had refused to submit to a full assessment, there was nevertheless "abundant clinical data" that led the doctor to a "solid clinical diagnosis and treatment recommendation." Specifically, Mother's behavior was consistent with paranoid schizophrenia.

{¶19} Also on October 30, 2017, the court held an evidentiary hearing. The agency requested to modify its motion for permanent custody to a planned permanent living arrangement. The court granted this motion to modify and proceeded to hear testimony from Eric Eichler ("Eichler," B.H.'s therapist), Dr. Amy Justice ("Dr. Justice," the clinical psychologist who evaluated Mother), the social worker in the case, and Mother.

{¶20} Eichler testified as to the treatment that B.H. received at Belmont Pines and stated that throughout his time at the facility, B.H. consistently stated that he wanted to be returned to Mother's custody. Dr. Justice testified as to the interview she conducted with Mother, her subsequent diagnosis of schizophrenia, the symptoms of schizophrenia, and Mother's refusal to engage in additional psychological testing. The social worker testified as to the relationship between Mother and B.H., the case plan goals for each of them, and the progress made toward those goals. The social worker testified that a planned permanent living arrangement would be in the child's best interest because B.H. had a strong desire to have a relationship with Mother, but returning him to Mother's custody would be detrimental to his progress. Mother testified that if B.H. were returned to her custody, she would encourage him to continue with whatever treatment was deemed necessary. She testified that she believed she had done whatever she was supposed to regarding her own services. While she acknowledged that she had struggled with mental health in the past and had been "stressed out," she denied having a mental health diagnosis at any point. Mother also reiterated some of the delusional statements she had made at other points throughout the case regarding the malicious intentions of court and agency officials and the staff treating B.H.

{¶21} On December 12, 2017, the court granted the agency's motion for a planned permanent living arrangement and issued a corresponding journal entry. The court found that it

was in B.H.'s best interest to preserve the relationship between him and Mother and that he gradually step down from his residential placement into a therapeutic foster home.

{¶22} Mother appeals, presenting one assignment of error for our review.

**Law and Analysis**

{¶23} In her sole assignment of error, Mother argues that the trial court's decision to award permanent custody to CCDCFS was against the manifest weight of the evidence because it was not supported by clear and convincing evidence. As a preliminary matter, we note that the juvenile court did not grant permanent custody to CCDCFS. It granted the agency's motion for a planned permanent living arrangement.

{¶24} A planned permanent living arrangement is statutorily defined as follows:

> "Planned permanent living arrangement" means an order of a juvenile court pursuant to which both of the following apply:
>
> (a) The court gives legal custody of a child to a public children services agency or a private child placing agency without the termination of parental rights.
>
> (b) The order permits the agency to make an appropriate placement of the child and to enter into a written agreement with a foster care provider or with another person or agency with whom the child is placed.

R.C. 2151.011(B)(38). A juvenile court may place a child adjudicated to be abused, neglected, or dependent in a planned permanent living arrangement if the agency so requests such a placement and if the court finds by clear and convincing evidence that a planned permanent living arrangement is in the best interest of the child, that the child is 16 years of age or older, and that one of the following exists:

(a) The child, because of physical, mental, or psychological problems or needs, is unable to function in a family-like setting and must remain in residential or institutional care now and for the foreseeable future beyond the date of the dispositional hearing held pursuant to section 2151.35 of the Revised Code.

(b) The parents of the child have significant physical, mental, or psychological problems and are unable to care for the child because of the those problems, adoption is not in the best interest of the child, as determined in accordance with division (D)(1) of section 21151.414 of the Revised Code, and the child retains a significant and positive relationship with a parent or relative.

(c) The child has been counseled on the permanent placement options available to

the child, and is unwilling to accept or unable to adapt to a permanent placement.

R.C. 2151.353(A)(5). Clear and convincing evidence is defined as "that measure or degree of proof which is more than a mere 'preponderance of the evidence' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts to be established." *In re Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist.1994).

{¶25} After a thorough review of the testimony and other evidence in the record, we find there was competent and credible evidence that supported the juvenile court's finding that a planned permanent living arrangement was appropriate pursuant to the requirements of R.C. 2151.353(A)(5).

{¶26} In this case, the trial court found that there was clear and convincing evidence that a planned permanent living arrangement was in the best interest of B.H., that B.H. was 16 years of age or older, and that placement was supported under R.C. 2151.353(A)(5)(a) and (b). Relative to subsection (a), the court found that it was in B.H.'s best interest that he "gradually step down from his residential placement at Belmont Pines into a therapeutic foster home where he can learn independent living skills that he will need when he becomes a legal adult."

Relative to subsection (b), the court found that the "Court Diagnostic Clinic found that the mother presented with features of Schizophrenia, Paranoid type[,]" was not in treatment to manage this, and therefore was "unable to care for the child" and address his mental health needs.

{¶27} All of these findings are supported by clear and convincing evidence. The record contains ample evidence of B.H.'s struggles and progress with his treatment at Belmont Pines, including the testimony elicited from Eichler and numerous reports completed over the course of the case. Further, less restrictive placement options for B.H. were attempted numerous times and were ultimately unsuccessful. The record also contains ample evidence of Mother's mental health issues. Dr. Justice testified as an expert witness that she had diagnosed Mother with paranoid schizophrenia. This diagnosis was reached after an interview lasting several hours, in which Mother displayed a lack of acceptance of reality, delusions and thought distortions, and reported what Dr. Justice referred to as "hallucinatory phenomena." Further, Mother's behavior throughout the case, including her refusal to engage with agency officials, her noncompliance with the case plan, and her disparaging and at times violent treatment of individuals involved in the case, also supports this finding.

{¶28} In determining the best interest of the child, the court must consider all relevant factors, including those listed in R.C. 2151.414(D), such as the child's relationship with their parents, the child's wishes, and the child's need for a legally secure permanent placement. Based on these factors, the record contains clear and convincing evidence that a planned permanent living arrangement was in B.H.'s best interest. The record contains multiple references to the existence of a strong relationship between B.H. and Mother, and Mother's love for B.H. This bond clearly manifested itself in multiple attempts by B.H. to leave his placement and reunite with Mother. Similarly, the record is clear that B.H. wished to maintain his

relationship with Mother, even as it became clearer to him that it was unlikely that Mother would have custody of him again. B.H. had been in agency custody for almost two years at the time of the trial in this case. He had a great need for a legally secure placement where he could continue receiving necessary care and treatment. All of this supports the trial court's finding that a planned permanent living arrangement was in the best interest of B.H.

**{¶29}** For these reasons, we affirm the judgment of the trial court.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, PRESIDING JUDGE

ANITA LASTER MAYS, J., and
KATHLEEN ANN KEOUGH, J., CONCUR